**Lionel James CASEY, Appellant,**

v.

**DEPARTMENT OF STATE, et al.**

**No. 91–5048.**

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 21, 1992.

Decided Dec. 18, 1992.

---

Department's Freedom of Information Act regulation.

45 C.F.R. § 11.6(a) (1991).

John D. Cline, with whom Peter J. Kahn and John P. Monahan, III, Washington, D.C., were on the brief, for appellant.

Sally M. Rider, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., John D. Bates and R. Craig Lawrence, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellees.

Before WALD, SILBERMAN, and SENTELLE, Circuit Judges.

Opinion for the Court filed by Circuit Judge SILBERMAN.

Opinion concurring in the judgment filed by Circuit Judge WALD.

SILBERMAN, Circuit Judge:

Lionel James Casey appeals the district court's dismissal of his claim that the State Department violated his statutory, constitutional, and Treaty based rights in seeking his extradition from Costa Rica. Casey asserts that the State Department misled Costa Rican officials by informing them that he would be tried for both substantive narcotics offenses and RICO violations, although his indictment only covered the RICO counts. This misrepresentation injured Casey, it is argued, because the relevant treaty permits extradition for the substantive narcotics violations but not the RICO violations. The district court concluded that the Costa Rican courts had interpreted the extradition Treaty to include RICO offenses and dismissed Casey's complaint for failure to state a claim upon which relief could be granted. We think that Casey's claims are not timely because he still is litigating in the Costa Rican courts and he has not yet been extradited to the United States. Accordingly, we affirm the district court, but on the alternative ground that it lacked subject matter jurisdiction over the dispute.

## I.

On May 16, 1986, a federal grand jury indicted Casey, an American citizen who

resides in Costa Rica, for two violations of the Racketeer Influenced and Corrupt Organization Act (RICO), 18 U.S.C. § 1961, *et seq.* He was indicted for association with a racketeering organization, § 1962(c), and for conspiring to violate the RICO statute, § 1962(d). The underlying racketeering acts on which the RICO counts were based involved drug trafficking, but Casey was not charged directly on a substantive narcotics offense.

Following the indictment, the United States began proceedings to extradite Casey from Costa Rica. On October 4, 1988, the United States Embassy in San Jose, Costa Rica, sent Diplomatic Note 215 to Costa Rican officials requesting that they arrest Casey pending extradition. The Note informed Costa Rican officials that Casey was subject to an indictment "charging him with" the two RICO violations and with two substantive narcotics offenses.[1] It is alleged that the Costa Rican authorities arrested Casey on October 10, 1988, pursuant to Diplomatic Note 215. Casey has remained in custody ever since.

The Treaty for the Mutual Extradition of Fugitives from Justice, Nov. 10, 1922, U.S.–Costa Rica, 43 Stat. 1621, (the "1922 Treaty"), as supplemented by the Single Convention on Narcotic Drugs, Mar. 30, 1961, 18 U.S.T. 1408, and the Protocol Amending the Single Convention on Narcotic Drugs, Mar. 25, 1972, 26 U.S.T. 1441, governs this extradition. The United States is obliged by the Treaty to provide documentation to support a request for extradition. 1922 Treaty, art. XI. Accordingly, on December 9, 1988, the United States Embassy sent Diplomatic Note 260 which furnished the necessary documentation. That second Diplomatic Note included an affidavit from the prosecutor, Assistant U.S. Attorney Paul J. Moriarty, the original indictment of January 22, 1986, the

superseding indictment of May 16, 1986, affidavits from two of Casey's alleged co-conspirators, and copies of the relevant sections of the United States Code.

Casey resisted his extradition in both the United States and Costa Rica. He moved, on December 1, 1988, in the District Court for the Middle District of Florida for a stay of the extradition proceeding. He asserted that the 1922 Treaty does not cover RICO offenses and that therefore the attempt to extradite him violated the Constitution. The government argued that the court lacked jurisdiction, both because the court could not direct the proceedings of the Costa Rican courts, and because Casey's claims were not ripe. On December 20, 1988, the district court judge denied Casey's motion for lack of jurisdiction in a single sentence without indicating which argument had persuaded him.

At about the same time, Casey raised a similar claim in the Costa Rican courts. But the Second Criminal Court of San Jose found him extraditable on January 23, 1989. Casey subsequently lost his direct appeal to the Second Superior Penal Court of Costa Rica on March 8, 1989. He currently has a *"habeas corpus"* petition pending before the Costa Rican Supreme Court, which awaits the United States' response; the Embassy requested additional time to respond on April 27, 1992. Casey, therefore, has raised the same claims he brings before this court in three Costa Rican proceedings, one of which is still pending.

Meanwhile, Casey renewed his efforts to resist his extradition in the United States courts. On December 19, 1990, Casey filed a complaint in the United States District Court for the District of Columbia. He claimed that the State Department's alleged misrepresentations in the first Note

---

**1.** Diplomatic Note 215 states in the relevant section that:

Casey is the subject of a superseding indictment filed on May 16, 1986 in the U.S. District Court for the Middle District of Florida charging him with (1) associating with a racketeering-influenced and corrupt organization (RICO), in violation of 18 U.S.C. [§] 1962(C); (2) conspiracy to violate the RICO statute, in

violation of 18 U.S.C. [§] 1962(D); (3) importation and aiding and abetting the importation of cocaine, in violation of 21 U.S.C. [§] 952(A) and 18 U.S.C. [§] 2; and (4) possession with intent to distribute cocaine, and aiding and abetting the possession with intent to distribute cocaine, in violation of 21 U.S.C. [§] 841(A)(1) and 18 U.S.C. [§] 2.

(215) violated his statutory and constitutional rights, as well as his rights under the 1922 Treaty. Casey argued that the State Department recognized that, although substantive narcotics violations are extraditable crimes under United States treaties with Costa Rica, RICO falls outside the treaties' coverage. Consequently, Casey contended the State Department deliberately misrepresented the nature of the crimes charged to ensure Casey's extradition. Casey requested a declaratory judgment that the State Department acted illegally, and preliminary and permanent injunctions preventing the State Department from seeking his extradition *on the basis* of the misrepresentations.

The government moved to dismiss for lack of subject matter jurisdiction, or alternatively for failure to state a claim on which relief could be granted. On February 22, 1991, the district court denied Casey's application for a preliminary injunction and granted the government's motion to dismiss. *Casey v. Department of State*, Civil Action No. 90–3077, Mem.Op. at 10 (D.D.C. Feb. 22, 1991). The district court rejected the government's jurisdictional arguments but concluded that Costa Rica had determined that RICO was an extraditable crime and consequently Casey's theory of the case was based on an incorrect premise. The district court, therefore, dismissed Casey's complaint for failure to state a claim upon which relief could be granted. *Id.* at 9. We affirm the district court's decision to dismiss Casey's complaint, but we do so on the alternative ground that the district court lacks jurisdiction to hear the case at this time.

II.

■ Casey's fundamental claim is that his extradition would violate the doctrine of "dual criminality" which is incorporated into the 1922 Treaty between the United States and Costa Rica.[2] Under this doctrine "an accused person can be extradited only if the conduct complained of is considered criminal by the jurisprudence or under the laws of both the requesting and requested nations." *Quinn v. Robinson*, 783 F.2d 776, 783 (9th Cir.), *cert. denied*, 479 U.S. 882, 107 S.Ct. 271, 93 L.Ed.2d 247 (1986). It is Casey's argument that the State Department dressed up the RICO charges against him in narcotics offense garb because there is no Costa Rican analog to RICO. The government contends that the district court lacked jurisdiction because Casey's complaint, in effect, called upon the court to "review" the proceedings in the Costa Rican courts.[3] Casey, implicitly conceding that it would be improper for the district court to oversee the determinations of the Costa Rican courts, asserts that it is not necessary to do so. He contends that only the State Department's behavior—not that of the Costa Rican courts—is called into question by his lawsuit. He simply wants the district court to enjoin the United States government's prosecution of the extradition.

■ The difficulty with Casey's argument is that in order to establish Article III standing in the district court he must claim that the allegedly illegal State Department behavior *caused* his injury. In other

---

**2.** In addition to his dual criminality claim under the Treaty, Casey alleges violations of the Administrative Procedure Act and his Fourth and Fifth Amendment rights. We think, however, that all these claims boil down to a contention that the State Department sought his extradition in violation of the dual criminality principle.

**3.** The government also argues that the Middle District of Florida's dismissal of Casey's 1988 motion to stay his extradition for lack of jurisdiction bars his current complaint. The government correctly observes that although a dismissal for lack of jurisdiction does not have the same broad preclusive effect as a dismissal on

the merits, it will "preclude relitigation of the precise issue of jurisdiction that led to the initial dismissal." *GAF Corp. v. United States*, 818 F.2d 901, 912 (D.C.Cir.1987). In the Florida litigation, the government offered two alternative theories as to why the court lacked jurisdiction. The court granted the motion to dismiss without explaining on which ground it relied. Whatever the general preclusive effect of alternative and independent holdings in this circuit, *see Dozier v. Ford Motor Co.*, 702 F.2d 1189, 1193–94 & n. 10 (D.C.Cir.1983), we cannot isolate "the precise issue of jurisdiction" decided by the Florida court and therefore assign no preclusive weight to the dismissal.

words, he must assert, explicitly or implicitly, that the Costa Rican courts were misled by the first Diplomatic Note as to the nature of his indictments in the United States, and that his incarceration and pending extradition proceedings in Costa Rica followed from that misunderstanding. Indeed, if the Costa Rican courts were not misled—if, for example, they had recognized that the United States sought Casey for RICO charges alone and had extradited Casey even though Costa Rica lacks a RICO analog—then Casey would not be permitted to contest his extradition even after he was extradited. *See United States v. Merit*, 962 F.2d 917, 920–21 (9th Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 244, 121 L.Ed.2d 178 (1992); *United States v. Riviere*, 924 F.2d 1289, 1301 (3d Cir.1991) (observing that countries are free to waive extradition treaty provisions). To conduct an inquiry into the rationale of the Costa Rican judicial decisions, the district court must undertake a careful analysis of the Costa Rican courts' reasoning process which inevitably runs the risk of second-guessing their decisions—and to do so while their proceedings are still ongoing. As it happens, the district court thought the Costa Rican courts were not misled at all, but rather construed the Treaty, contrary to Casey's suggestion, to permit extradition for RICO offenses. It was not appropriate for the district court to answer that question, however—certainly at this stage in the proceedings—because the Costa Rican courts have not finally adjudicated

the matter.[4] The district court decision may actually further cloud the Costa Rican proceedings. It was communicated to Costa Rican officials by the State Department through a third Diplomatic Note, and the Costa Rican Supreme Court could well be uncertain as to what weight to give the district court's opinion.

■ We think a proper reading of the United States case law and principles of international comity lead ineluctably to the conclusion that the district court lacked jurisdiction. Many years ago the Supreme Court, in *Johnson v. Browne*, 205 U.S. 309, 27 S.Ct. 539, 51 L.Ed. 816 (1907), held that "[w]hether the crime came within the provision of the treaty was a matter for the discretion of the [Canadian] authorities, and such decision was final by the express terms of the treaty itself." *Id.* at 316, 27 S.Ct. at 540. To be sure, under the extradition treaty between the United States and Canada in *Johnson* a specific provision granted finality to the decision of the state surrendering the fugitive as to whether a crime was covered by the treaty. But other circuit courts have read *Johnson* broadly to apply to all extradition treaties. *See, e.g., United States v. Van Cauwenberghe*, 827 F.2d 424, 429 (9th Cir.1987), *cert. denied*, 484 U.S. 1042, 108 S.Ct. 773, 98 L.Ed.2d 859 (1988); *McGann v. United States Bd. of Parole*, 488 F.2d 39, 40 (3rd Cir.1973) (per curiam), *cert. denied*, 416 U.S. 958, 94 S.Ct. 1974, 40 L.Ed.2d 309 (1974).[5] The government, in order to bol-

---

4. Even if the Costa Rican courts were misled, it remains an open question in this circuit whether Casey has "standing" to raise his claims after extradition. *See United States v. Sensi*, 879 F.2d 888, 892 n. 1 (D.C.Cir.1989) (reserving question of defendant's standing to raise specialty principle). As a contract between the United States and Costa Rica, the 1922 Treaty arguably protects the interests and rights of only the signatory nations, rather than those of the fugitive.

5. The concurrence suggests that *Johnson* demonstrates that United States courts may scrutinize a foreign court's reasoning. In *Johnson* Canada refused to extradite the fugitive for one crime, but subsequently extradited him for a different crime. When authorities in the United States attempted to prosecute the fugitive for the first crime, the Supreme Court found a clear violation of the principle of specialty—the rule

that a fugitive can only be prosecuted for the crime for which he was extradited. *Johnson*, 205 U.S. at 320, 27 S.Ct. at 542. To support this conclusion, the Supreme Court hypothesized that a Canadian court fully informed of the United States' intentions would not have extradited the fugitive—a section which the concurrence quotes at length. This hypothetical did not suggest that the Court undertook detailed scrutiny of the actual Canadian decision. Rather, the Supreme Court took the Canadian court's actual decisions at face value and gave them full effect.

Our colleague points out that under our reasoning a United States court could not intervene even if the misrepresentation were as plain as that in *Johnson—i.e.* if the United States had falsely stated that Casey was charged with murder and Costa Rica extradited him for murder.

ster its jurisdictional argument, accordingly argues that an extradition decision is *entirely* within the discretion of the extraditing country. The government may be correct. But Casey points out that some American courts, including this circuit, have entertained claims on the merits that a foreign court's extradition decision violated a treaty. *See, e.g., United States v. Sensi,* 879 F.2d 888, 893 (D.C.Cir.1989) (rejecting a dual criminality claim on the merits, while reserving the jurisdictional question); *Merit,* 962 F.2d at 921–22 & n. 4.

■ Nevertheless, it seems clear to us that, at a minimum, *Johnson* means that an American court must give great deference to the determination of the foreign court in an extradition proceeding. This deference is necessary to further international comity—a goal the Supreme Court has emphasized in a variety of contexts. *Cf. E.E.O.C. v. Arabian American Oil Co.,* — U.S. —, —, 111 S.Ct. 1227, 1230, 113 L.Ed.2d 274 (1991) (applying a presumption against the extraterritorial application of United States laws); *McCulloch v. Sociedad Nacional de Marineros de Honduras,* 372 U.S. 10, 20–22, 83 S.Ct. 671, 677–78, 9 L.Ed.2d 547 (1963) (applying a presumption that congressional statutes do not violate the laws of foreign nations or international law); *Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964) (limiting judicial review of the acts of sovereign nations through the act of state doctrine). Surely, a foreign court's holding as to what that country's criminal law provides should not lightly be second-guessed by an American court—if it is ever reviewable. And the foreign court's understanding of the nature of the American charge is, in truth, inextri-

cably intertwined with its reading of its own law.

Our concurring colleague concedes that we must defer to the dual criminality determinations of foreign courts, but she perceives a distinction between that circumstance and our evaluation of the Costa Rican courts' reasoning process to determine whether they relied on the State Department's misrepresentation in this case. But that is because the concurrence views this inquiry as a simple binary test—either the Costa Rican courts found a local RICO analog or the misrepresentation caused Casey to be extradited. In reality, the problem is a good deal more subtle; a decision to extradite could reflect not just two but a virtually infinite number of different reasoning paths, each with different implications as to whether the Costa Rican courts relied on the alleged misrepresentation.

We should bear in mind that even though Casey was not charged with independent drug trafficking crimes, the predicate acts of the RICO charge were narcotics related. And RICO is one of the most confusing crimes ever devised by the United States Congress. *E.g., H.J., Inc. v. Northwestern Bell Telephone Co.,* 492 U.S. 229, 252–56, 109 S.Ct. 2893, 2907–09, 106 L.Ed.2d 195 (1989) (Scalia, J., concurring). Therefore, it might be impossible to determine whether the alleged misrepresentation contributed to the Costa Rican courts' search of Costa Rican law for an analog. In other words, even if the Costa Rican courts did find a RICO analog, how much were they led to do so by thinking generically about drug trafficking conspiracy law?[6] Or suppose the Costa Rican courts were to conclude that it is not necessary under the Treaty to find a *precise* analog to RICO? Does that

Sep.Op. at 1475 n. 3. To the extent she implies that we would not review that hypothetical case at this stage in the proceedings, the concurrence is correct. But, because the doctrine of specialty applied in *Johnson* would prevent the United States from prosecuting the hypothetical Casey for any crime other than murder, it is difficult to see how this result would harm him or why the United States would make the misrepresentation in the first place.

**6.** The Costa Rican courts, if they incorrectly believed that Casey was charged with RICO and

substantive narcotics crimes, could have found *both* a RICO analog and a drug trafficking analog in Costa Rican law. In such a case, in order to decide whether the Costa Rican courts meaningfully relied on the alleged misrepresentation, the United States courts would have to determine whether the Costa Rican courts' mistaken belief about the substantive narcotics charges led them to truncate their analysis of their alternative finding of a RICO analog.

mean they were influenced by the alleged misrepresentation or that they merely decided to defer to the United States' request—in effect waiving their dual criminality rights under the Treaty? *See infra* at 1481–82. That is not all. Suppose we were to decide that the Costa Rican courts misconstrued dual criminality analysis (in which case we would have to conclude that what we think is a legal error, not the alleged misrepresentation, led to extradition) or that the opinion—as is true of so many of our own opinions, is so terse that its meaning cannot be safely determined? The Costa Rican lower court's opinion (or at least its translation) might be thought to have avoided some of these difficulties, but substantial ambiguity remains. The opinion mentions the substantive narcotics charges, refers to Diplomatic Note 215, and does not clearly find a RICO analog.

These analytical problems—difficult as they would be if raised by the defendant after extradition—are substantially magnified in this case because the Costa Rican courts have not yet completed their review of Casey's claims. As our concurring colleague apparently concedes, Sep.Op. at 1474 n. 1, we should not interfere at this stage in the proceedings because we cannot afford full deference to the decisions of the foreign court until they are completed.[7] And we cannot assume that the Costa Rican proceedings are complete until Casey is extradited into the United States. The potential confusion of parallel proceedings and the possibility that the Costa Rican court will resolve the dispute in such a way as to obviate any need for further American litigation on the issue also weigh against adjudication in the American courts at this time. We see analogies in the doctrine of ripeness, exhaustion, and abstention. But it is sufficient to rely on those considerations of international comity foreshadowed in *Johnson*.

It is also worth noting, however, that asserting jurisdiction at this stage could interfere with the State Department's conduct of Casey's extradition. The concurrence's proposed remedy would be "to enjoin the United States government from continuing to pursue extradition on the basis of the misrepresentation." Sep.Op. at 1479. When asked to review the executive branch's prosecution of a criminal case, the Supreme Court has observed, however, that the prosecutor must "have wide discretion in the conduct of the trial and the presentation of evidence," and has found post-trial procedures sufficient to prevent abuse of the prosecutor's discretion. *Imbler v. Pachtman*, 424 U.S. 409, 426–27, 96 S.Ct. 984, 993, 47 L.Ed.2d 128 (1976). We think that the State Department has a latitude in conducting extraditions analogous to a prosecutor's discretion. The State Department may enjoy even greater freedom because of the judiciary's traditional deference to the executive branch's conduct of foreign affairs. *E.g.*, *Chicago & S. Air Lines, Inc. v. Waterman Steamship Corp.*, 333 U.S. 103, 111, 68 S.Ct. 431, 436, 92 L.Ed. 568 (1948). Moreover, the sort of interference with the executive branch's prosecution of an extradition proceeding that the concurrence visualizes would seem to us to raise separation of powers concerns. If we were to "enjoin the misrepresentation," for example, putting aside the question of interference with the executive branch's conduct of foreign relations, our action could rather easily lead us into directing the State Department in the manner in which it describes the indictment in the United States. When a federal court is drawn into the supervision of the prosecution it could be thought constitutionally to meet itself coming around in a circle. *Cf. Dunlop v. Bachowski*, 421 U.S. 560, 575–76 & n. 12, 95 S.Ct. 1851, 1861–62 & n. 12, 44 L.Ed.2d 377 (1975).

If Casey is ultimately extradited to the United States, he can then challenge his extraditability and thereby, in a timely manner, test the limits on our judicial review of the issues determined by the Costa Rican courts. Accordingly, we affirm the judgment of the district court, but on the alternative ground that the district court

---

7. As to Casey's Treaty based rights, it is difficult to understand how we can hear a dual criminal-ity claim—a claim that Casey was extradited improperly—until the extradition occurs.

lacks subject matter jurisdiction over the dispute.

WALD, Circuit Judge, concurring in the judgment:

I agree with the majority that an American court owes great deference, as a matter of international comity, to the determination of a foreign court that a fugitive within its jurisdiction is extraditable to the United States. *See* Majority Opinion ("Maj. Op.") at 1477. However, I do not believe that this venerable principle, announced by the Supreme Court in *Johnson v. Browne*, 205 U.S. 309, 27 S.Ct. 539, 51 L.Ed. 816 (1907), necessarily leads to the conclusion that an American detained in a foreign country on the basis of an alleged misrepresentation made by the United States Department of State in seeking his extradition has no recourse in the courts of his native land. The *Johnson* decision itself only states that "[w]hether the *crime* came within the provision of the treaty was a matter for the decision of the [Canadian] authorities...." 205 U.S. at 316, 27 S.Ct. at 540 (emphasis added). Thus, the Third Circuit has pointed out that "[t]he holding of *Johnson v. Browne* ... precludes any review of the [foreign] court's decision as to the *extraditable nature of the offense.*" *McGann v. United States Bd. of Parole*, 488 F.2d 39, 40 (3d Cir.1973) (emphasis added), *cert. denied*, 416 U.S. 958, 94 S.Ct. 1974, 40 L.Ed.2d 309 (1974); *see also United States v. Van Cauwenberghe*, 827 F.2d 424, 429 (9th Cir.1987) ("We agree with the Third Circuit's reading of *Johnson*"), *cert. denied*, 484 U.S. 1042, 108 S.Ct. 773, 98 L.Ed.2d 859 (1988). In other words, we must refrain from inquiring into whether the "dual criminality" principle, which requires that the offenses for which Casey was sought by the United States government also constitute crimes in Costa Rica, has been satisfied. In my view, however,

Casey's complaint does not require such an inquiry and therefore the district court properly ruled that it had jurisdiction over the case.

Casey alleged in his complaint that his arrest by Costa Rican officials in 1988 and subsequent detention pending extradition were the result of deliberate misinformation planted by the United States government in Diplomatic Note 215 ("Note 215"). Passing on the narrow issue of whether Casey's four years of detention in the Costa Rican prisons was the result of United States misconduct would not sacrifice international comity, because this court would not be second-guessing the Costa Rican courts' conclusion that Casey is extraditable under its own law. More specifically, it would not be necessary to disturb the Costa Rican courts' finding that the RICO offense either does or does not satisfy the dual criminality requirement. On the one hand, if the Costa Rican courts concluded that RICO offenses were crimes in that country, we would necessarily accept that determination under *Johnson*, 205 U.S. at 316, 27 S.Ct. at 540, and therefore conclude that the misrepresentation in Note 215 could not possibly have caused Casey to be found extraditable.

On the other hand, if the Costa Rican courts decided that their country's criminal code did not contain an offense sufficiently analogous to RICO but nevertheless decided that Casey was extraditable because he was "charged" with narcotics offenses which Costa Rica did recognize as criminal, we might then be able to conclude that the misstatement in Note 215 did lead to Casey's detention.[1] Even then, the remedy sought by Casey would *not* be to find Casey nonextraditable and thereby upset the Costa Rican courts' legal conclusion, but to enjoin the United States government from continuing to pursue extradition on the basis of the misrepresentation.[2]

---

1. Although I conclude that the district court properly heard Casey's claim because Casey suffers a present and ongoing injury as the result of his detention in Costa Rica, it would not have been inappropriate for the district court to hold the case in abeyance pending resolution of what the majority describes as Casey's *"habeas corpus"* petition before the Costa Rican Supreme

Court. *See* Maj.Op. at 1474. Casey's counsel agreed at oral argument that this would have been an acceptable result.

2. Because I would conclude, *infra* at 1475–76, that even after viewing the evidence in the light most favorable to Casey, he has failed to demon-

In neither scenario would this court decide that the foreign court's dual criminality analysis was correct or incorrect. The sole question for review would be whether the statement in Note 215 describing the superseding indictment against Casey as "charging him with" narcotics offenses was the proximate cause of his detention and pending extradition. The district court's decision dismissing Casey's complaint adopted this approach in holding:

> [N]othing in the opinions of the Costa Rican courts suggests that their analysis was affected, or indeed could have been affected, by the alleged misrepresentation in Diplomatic Note 215. Apparently applying the principle of double criminality, the Costa Rican courts found Casey extraditable because the conduct for which he is charged is punishable by Costa Rica.... Nothing in their opinions suggest that their analysis would have been affected by the formal charges pending against Casey. As a consequence, whether or not the Costa Rican courts believed that there were two RICO counts pending against Casey or that those two counts were joined by charges of importing and possessing cocaine, the Costa Rican courts would have found Casey extraditable.

*Casey v. Department of State*, Civil Action No. 90-3077, Memorandum Opinion ("Mem. Op.") at 9 (D.D.C. Feb. 22, 1991).

The doctrine of international comity does not prohibit this court from reading the decisions of the Costa Rican courts for evidence that United States government misconduct resulted in injury to a United States citizen, but only prevents this court from challenging a decision properly vested

in the foreign court, namely whether offenses satisfy the dual criminality requirement. *See Johnson*, 205 U.S. at 316, 27 S.Ct. at 540; *Van Cauwenberghe*, 827 F.2d at 429; *McGann*, 488 F.2d at 40. In fact, American courts have in the past considered the scope and reasoning of foreign court extradition decisions. In *Johnson*, for instance, the defendant was extradited from Canada for one offense but imprisoned in the United States for a different offense which Canada had previously determined was not an extraditable offense. *Johnson*, 205 U.S. at 316, 27 S.Ct. at 540. While the Court believed that "[w]hether the crime came within the provision of the treaty was a matter for the decision of the [Canadian] authorities," it continued that "it is still our duty to determine the legality of the succeeding imprisonment, which depends upon the treaty...." *Id.* at 316–17, 27 S.Ct. at 540–41. The Court found:

> We can readily conceive that if the [Canadian] authorities, after the [Canadian court] had decided that the crime of which respondent had been convicted and for which extradition had been asked was not extraditable, and the request for extradition had, therefore, been refused, had been informed on the subsequent proceeding for extradition on the other indictment that it was not the intention of this Government to try respondent on that indictment, but that having secured his extradition on that charge, it was the intention of this Government to imprison him on the judgment of conviction, they would have said that such imprisonment would not be according to the terms of the treaty, and they would have refused to direct his extradition for the purpose stated.

strate that the misstatement in Note 215 proximately caused him to be detained for extradition by Costa Rican officials, I would not reach the subsequent question of whether any government claim of absolute prosecutorial discretion would preclude the relief he seeks. *See* Maj.Op. at 1478 (citing *Imbler v. Pachtman*, 424 U.S. 409, 426–27, 96 S.Ct. 984, 993, 47 L.Ed.2d 128 (1976), in which Supreme Court held that prosecutors enjoy absolute immunity from damage claims arising from initiation and presentation of gov-

ernment's case). It is worth noting, however, that prosecutorial discretion is not limitless and that courts do retain the equitable power to enjoin bad faith prosecutions which are brought to discourage or prevent the exercise of constitutionally-protected rights. *See, e.g., Dombrowski v. Pfister*, 380 U.S. 479, 485–86, 85 S.Ct. 1116, 1120–21, 14 L.Ed.2d 22 (1965); *Lewellen v. Raff*, 843 F.2d 1103 (8th Cir.1988), *cert. denied*, 489 U.S. 1033, 109 S.Ct. 1171, 103 L.Ed.2d 229 (1989).

*Id.*[3]; *see also United States v. Jetter*, 722 F.2d 371, 373 (8th Cir.1983) (based on review of Costa Rican court's decision, "it is clear that Costa Rica would not object to appellants' trial on the conspiracy counts"); *Fiocconi v. Attorney Gen.*, 462 F.2d 475, 481 (2d Cir.), *cert. denied*, 409 U.S. 1059, 93 S.Ct. 552, 34 L.Ed.2d 511 (1972); *United States v. Paroutian*, 299 F.2d 486, 490–91 (2d Cir.1962). This case admittedly presents different facts and a different claim from those just cited but the rule that American courts have jurisdiction to consider the United States government's role in the extradition process seems just as reasonable and equitable in these circumstances. Courts have often reiterated that even in the area of foreign relations, "unquestionably, it is the province of the judiciary to adjudicate claims that governmental conduct is in violation of the Constitution." *Plaster v. United States*, 720 F.2d 340, 349 (4th Cir.1983). After being detained by Costa Rican officials, and certainly after four years of imprisonment in Costa Rica, Casey should at least have the opportunity to raise the claim in an American court that his rights were violated because authorities in the extraditing state were misled by inaccurate statements by United States officials about charges made in the United States.[4]

It seems an inadequate response to say that after all Costa Rican proceedings are complete and Casey is extradited to the United States he may then "test the limits on our judicial review of the issues determined by the Costa Rican courts." *See* Maj.Op. at 1478. Indeed, it is hard to see how this could be so under the rationale of the majority opinion—that the basis of a foreign court's finding that a fugitive is extraditable is in all circumstances unreviewable—which applies with equal force whether Casey is in Costa Rica or the United States. Presumably, if Casey were to raise his claim again in the United States, the majority would again conclude that it does not have jurisdiction to review the Costa Rican courts' decisions for an indica-

---

**3.** As the majority points out, *see* Maj.Op. at 1476 n. 5, it was a relatively simple exercise for the Supreme Court in *Johnson* to decide that the Canadian court would not have extradited the fugitive to the United States if it had known that the *United States'* intention was *to* imprison the fugitive for an offense for which the Canadian court had previously refused extradition. Under the majority's reasoning, however, even if the present case were as straightforward as *Johnson, e.g.,* the State Department intentionally misrepresented that Casey was charged with murder and the Costa Rican court issued a one-sentence order that "Casey is being extradited for murder," the American court could not hear his claim because it would require evaluating the Costa Rican decision in light of extrinsic evidence and hypothesizing that a Costa Rican court fully informed of the State Department malfeasance would not have found Casey extraditable. In my view, the probability that the inquiry into the factual predicate for a foreign court's decision may prove more complex than in *Johnson* (or in my hypothetical) does not invalidate the principle I derive from *Johnson* that domestic courts may engage in such determinations. Obviously, our courts conduct "but for" analyses, simple and complex, of the decisions of other courts and agencies all the time in other areas of the law as an intrinsic part of their reviewing function.

**4.** My colleagues assert that because an inquiry by an American court into the prejudicial effect of American prosecutorial abuse may involve parsing a foreign court's opinion, it violates the principle of international comity. *See* Maj.Op. at 1477–78. Certainly, determining whether the misstatement in Note 215 caused Casey to be incarcerated in Costa Rica could, like many causation questions, be complex. That, however, does not mean that the American court, in determining whether the State Department's alleged misstatement led Costa Rica to detain Casey, would be second-guessing, *i.e.*, challenging as incorrect, the Costa Rican "court's decision as to the extraditable nature of [RICO or narcotics] offense[s]." *See McGann,* 488 F.2d at 40. There is a clear difference between determining the factual predicate for a decision and concluding that a foreign court's legal analysis is faulty. Of course, even after a careful study of the Costa Rican courts' decisions, it might be impossible for an American court to tell whether the misrepresentation played any role in Casey's detention. In that case, the court must conclude that the burden of proving causation had not been met. If, however, the causation is clear (*e.g., the Costa Rican courts state that the* RICO charge does not satisfy the dual criminality requirement but the substantive narcotics offenses referred to in Note 215 do), the court would conclude *not* that the Costa Rican courts' analysis of its law or United States law was mistaken, but only that the United States government injured Casey by misleading Costa Rican officials.

tion that the misrepresentation in Note 215 led to Casey's detention and extradition.

However, although I disagree with my colleagues on the district court's jurisdiction to entertain Casey's claim, I would nevertheless conclude that his complaint was properly dismissed because it is clear from the evidence before the district court that the misrepresentation in Note 215 did not proximately cause Casey to be found extraditable. *See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977); W. PAGE KEETON ET AL., PROSSER AND KEETON ON THE LAW OF TORTS § 41, at 264–66 (5th ed. 1984). Most importantly, in response to the treaty requirement that a country transmit documentation to support a request for extradition, *see* Treaty for the Mutual Extradition of Fugitives from Justice, Nov. 10, 1922, U.S.–Costa Rica, art. XI, 43 Stat. 1621, the United States government sent Diplomatic Note 260 ("Note 260") which included an affidavit from the prosecutor, the original indictment, the superseding indictment, an arrest warrant for Casey, the affidavits of two of Casey's alleged co-conspirators, and copies of the relevant portions of the United States Code. None of these materials repeated the alleged misstatement in Note 215 that Casey was charged with narcotics offenses. Given the fact that Casey's alleged participation in narcotics trafficking constituted the predicate acts supporting his indictment on RICO charges, it is not at all clear that the statement in Note 215 constituted an actual misrepresentation. But even if I assume, as the district court did, *see Casey*, Mem.Op. at 4 n. 11, that the government's description of the superseding indictment amounted to a misrepresentation, I find it implausible that the Costa Rican courts would give great weight to the single word "charging" in Note 215 and ignore their treaty obligation to consider the documentation supporting the extradition request. A review of the decisions of the Costa Rican courts, again, not for the purpose of challenging the finding of extraditability but only to assess the impact of the government's misstatement, confirms the conclusion that even if Note 215 had been entirely accurate, Casey would still have been detained and found extraditable.

Neither the Second Criminal Court of San Jose nor the appellate tribunal, the Second Superior Penal Court, based its conclusion that Casey could be extradited on the mistaken belief that Casey was charged in the superseding indictment with narcotics offenses. Instead, after discussing the RICO offense, the documentation submitted with Note 260 and Costa Rican law, the Second Criminal Court concluded that Casey could be extradited on the basis of the RICO charges. Casey based his appeal "on the fact that the violation of the RICO Statute is not considered a crime autonomous to [Costa Rica]," but the appellate court expressly rejected this contention and affirmed the lower court. The inaccuracy of Note 215 was therefore immaterial.

In sum, I believe the district court was correct in concluding that it had jurisdiction to hear Casey's claim that his rights were violated by misstatements made by the United States government in seeking his extradition from Costa Rica but that Casey's complaint should be dismissed because the evidence clearly indicated that the misstatement was not the proximate cause of his detention and pending extradition.